UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| ELEVANCE HEALTH, INC., an Indiana corporation; ANTHEM INSURANCE COMPANIES, INC., an Indiana corporation, BLUE CROSS AND BLUE SHIELD ASSOCIATION, an Illinois not-for-profit corporation, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No.: 1:25-cv-03590-WMR |
| v. | ) ) ) | **PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| LIFEX RESEARCH CORPORATION, a Georgia corporation; BENEFIT HEALTH PLAN INC., a Wyoming Corporation; STEPHEN TUCKER, an individual; RYSZARD BOLKO, an individual; THERESE HOARD, an individual; WILLIAM MCCLURE, an individual; and KRISTIN BULLOCK, an individual. | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Pursuant to Fed. R. Civ. P. 65, Plaintiffs Elevance Health, Inc. f/k/a Anthem, Inc. ("Elevance"), Anthem Insurance Companies, Inc. ("AIC") (Elevance and AIC hereafter referred to collectively as "Anthem") and Blue Cross and Blue Shield Association ("BCBSA") (Anthem and BCBSA hereafter referred to collectively as "Plaintiffs") move this Court for an entry of a temporary restraining order and preliminary injunction against Defendants LifeX Research Corporation ("LifeX"), Benefit Health Plan Inc. ("Benefit Health"), Stephen Tucker, Ryszard Bolko, Therese Hoard, William McClure, and Kristin Bullock (collectively, "Defendants"). This motion is supported by the Memorandum of Points and Authorities filed concurrently herewith, the Complaint, all exhibits attached to the Complaint, and all other supporting documents filed concurrently with this Motion.

As part of a scheme to induce consumers to purchase health insurance through an alleged employee benefit plan, Defendants have willfully and improperly used AIC's ANTHEM® mark and BCBSA's BLUECARD®, BLUE CROSS® and BLUE SHIELD® word marks and logos (the "BCBS Marks") in blatant violation of Plaintiffs' trademark rights. Specifically, Defendants affixed Plaintiffs' trademarks to counterfeit health insurance cards and marketing materials, falsely representing LifeX as an authorized client and group policy holder of Anthem Blue Cross and Blue Shield ("Anthem BCBS") health insurance – without Plaintiffs' knowledge, authorization, or consent. Defendants' misuse of Plaintiffs' trademarks is a deliberate fraud on consumers. LifeX does not maintain any employee benefit plan with Anthem and is not affiliated with Plaintiffs in any way. By misrepresenting this relationship, Defendants are deceiving unsuspecting purchasers of health insurance and health care providers alike, placing the public at significant risk. Consumers purchasing this so-called benefits plan from LifeX will not receive the health insurance coverage that they believed they purchased because LifeX has no actual relationship with Plaintiffs and no authority to offer benefits under or related to an Anthem BCBS plan. Indeed, LifeX is willfully selling consumers an employee benefits health insurance plan that does not exist. Multiple consumers have already been damaged by this fraud when they attempted to seek treatment from providers in BCBSA licensee health plan networks and were informed that LifeX's purported association with Anthem BCBS was illusory. This egregious misconduct threatens public health and safety and must be stopped immediately.

For these reasons, and those addressed more fully in Plaintiffs' Memorandum of Points and Authorities, Plaintiffs submit that that: (i) they are substantially likely to prevail on the merits of their claims for trademark infringement, trademark dilution, false designation of origin, and unfair

competition claims; (ii) they will suffer irreparable harm absent the entry of the requested temporary and permanent injunctive relief; (iii) the balance of harms strongly favors issuance of the requested injunctions; and (iv) the public will benefit from the issuance of the injunctions.

Therefore, Plaintiffs respectfully move this court to temporary enjoin and restrain the Defendants and their principals, agents, servants, employees, attorneys, and other persons in active concert from:

1. Using the ANTHEM, BLUECARD, BLUE CROSS, and BLUE SHIELD Marks, or any versions thereof, in connection with the offer of employee benefit plans or health insurance ID cards;

2. Assisting, aiding, or abetting any other person or entity in using the ANTHEM, BLUECARD, BLUE CROSS, and BLUE SHIELD Marks, or any versions thereof, in connection with the offer of employee benefit plans or health insurance ID cards.

Plaintiffs further request that, pursuant to Fed. R. Civ. P. 65(a) and (c), a preliminary injunction be entered, and that the Court set a hearing on Plaintiff's motion for a temporary restraining order and preliminary injunction at the earliest possible time.

Dated: July 2, 2025

Respectfully submitted,

REED SMITH LLP

*/s/ David W. Long-Daniels*
David W. Long-Daniels (SBN 141916)
Email:   dlong-daniels@reedsmith.com
REED SMITH LLP
999 Peachtree Street NE
Suite 2500
Atlanta, GA  30309
Telephone: +1 470 947 5800
Facsimile: +1 470 947 5799

Robert N. Phillips (*Pro Hac Vice application pending*)
Email:   robphillips@reedsmith.com
Seth B. Herring (*Pro Hac Vice application pending*)
Email:   sherring@reedsmith.com
Fatima Mobin (*Pro Hac Vice application pending*)
Email:   fmobin@reedsmith.com
REED SMITH LLP
101 Second Street
Suite 1800
San Francisco, CA  94105-3659
Telephone: +1 415 543 8700
Facsimile: +1 415 391 8269

Counsel for Plaintiffs

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

Plaintiffs Elevance Health, Inc. f/k/a Anthem, Inc. ("Elevance"), Anthem Insurance Companies, Inc. ("AIC") (Elevance and AIC hereafter referred to collectively as "Anthem") and Blue Cross and Blue Shield Association ("BCBSA") (Anthem and BCBSA hereafter referred to collectively as "Plaintiffs") submit this Memorandum of Points and Authorities in support of their Motion for Temporary Restraining Order and Preliminary Injunction ("Motion") to restrain and enjoin Defendants LifeX Research Corporation, Benefit Health Plan Inc., Stephen Tucker, Ryszard Bolko, Therese Hoard, William McClure, and Kristin Bullock (collectively, "Defendants") from their unauthorized use of Plaintiffs' valuable trademarks as part of a scheme to deceive consumers into believing they are obtaining an Anthem Blue Cross and Blue Shield health insurance plan, when in fact they are not.

## I.    <u>INTRODUCTION</u>

This action arises out of Defendants' unauthorized use of Plaintiffs' trademarks in connection with purported health insurance for Defendants' employees. In a particularly egregious scheme to lure unsuspecting individuals to work for LifeX and purchase nonexistent group health insurance, LifeX has included AIC's ANTHEM® mark and BCBSA's BLUECARD®, BLUE CROSS®, and BLUE SHIELD® word marks and logos (the "BCBSA Marks") in its marketing materials and counterfeit health insurance identification cards. LifeX holds itself as an authorized client of an Anthem Blue Cross Blue Shield insurance plan ("Anthem BCBS") and is actively deceiving its employees into believing they are enrolled in an insurance plan that provides the benefits of the Anthem BCBS provider network. But LifeX is not affiliated with Plaintiffs or any of their member plans.  In fact, persons victimized by Defendants' scam may not be covered by *any* health insurance plan.

Defendants' unauthorized use of Plaintiff's trademarks is likely to cause—and indeed, has already caused—consumer confusion. Multiple consumers have already been damaged by this fraud when they paid Defendants for nonexistent group health insurance and attempted to seek treatment from providers in Anthem BCBS insurance company networks and were informed that LifeX's purported association with Anthem BCBS was illusory.  If not stopped, Defendants' use of the ANTHEM, BLUECARD, BLUE CROSS, and BLUE SHIELD trademarks in their duplicitous scheme will not only continue to mislead consumers but will also tarnish Plaintiffs' reputations and cause Plaintiffs to suffer irreparable harm.

Defendants' use of Plaintiffs' ANTHEM, BLUECARD, BLUE CROSS, and BLUE SHIELD trademarks in their predatory scheme also creates a grave risk to public health and safety. Individuals who believe they are covered by an Anthem BCBS health insurance plan may seek medical services that are purportedly covered by insurance—only to be left with a surprise bill for hundreds, if not thousands, of dollars, or to be refused medical treatment altogether. Given the Defendants' misappropriation of Plaintiffs' exact word marks and logos, Defendants' victims are not likely to realize they lack health insurance coverage until they need medical care—for many people, this can quite literally make the difference between life and death. Public safety necessitates that Defendants' illicit conduct must be stopped immediately.

## II.    FACTUAL BACKGROUND

### A. BCBSA and the BLUECARD, BLUE CROSS, and BLUE SHIELD Marks

BCBSA is a national association of 33 independent, community based and locally operated health benefits companies and the owner of the BCBSA Marks. Declaration of Rich Cullen ("Cullen Decl."), ¶2.  BCBSA licenses these companies to offer BLUE CROSS and BLUE SHIELD healthcare plans that currently provide

healthcare coverage for approximately 118 million people in the United States—
approximately 1 in 3 Americans—in all 50 states, the District of Columbia, and in
Puerto Rico (the "BCBS Companies"). *Id.* at ¶6. Nationwide, more than 2 million
doctors and hospitals contract with the BCBS Companies—more than any other
individual non BCBS insurer. *Id.*

The BLUE CROSS and BLUE SHIELD word marks and logos have been
used since at least as early as 1934 and 1939, respectively, by the BCBS
Companies in connection with the provision of health and life insurance, health
care delivery services, financing access to healthcare, and related goods and
services ("BLUE CROSS and BLUE SHIELD Marks").  Declaration of Melissa
Rotunno ("Rotunno Decl.") ¶3. The BLUE CROSS and BLUE SHIELD logos
appear as follows:



*Id*.

The BCBS Companies, including Anthem, use the BLUE CROSS and
BLUE SHIELD Marks in commerce in connection with healthcare and health
insurance in all 50 states. Cullen Decl. at ¶9. Anthem is the largest BCBS
Company, operating in 14 states, including Georgia. Anthem conducts business as
BCBSA's licensee under the names "Anthem Blue Cross" and "Anthem Blue
Cross and Blue Shield" ("Anthem BCBS"). *Id.*

The BLUE CROSS and BLUE SHIELD Marks are among the most
recognized brands in the health and health-related industries in the world.  In past
years, annual net revenue for services under the BLUE CROSS and BLUE
SHIELD Marks has exceeded $300 billion domestically.  *Id*. at ¶10. U.S. federal

district courts and other legal panels such as the World Intellectual Property Organization have expressly recognized the fame of the BLUE CROSS and BLUE SHIELD Marks. *Infra*, Section IV.B.1.

BCBSA's BlueCard® program allows beneficiaries of BCBS Company plans to access their coverage and receive in-network insurance benefits from the provider networks of other BCBS Companies when they receive medical services in states and areas other than those in which their BCBS Company operates (the "BLUECARD Mark"). Cullen Decl. at ¶7. If, for example, an Anthem BCBS plan beneficiary receives medical care in Texas (a state where Anthem BCBS does not operate), the Anthem BCBS plan makes a coverage determination and, if the services are covered, the BCBS Company that operates in Texas pays the claim and the Anthem BCBS plan reimburses it. *Id.* BCBSA and/or BCBS Companies have been using the BLUECARD Mark since at least as early as 1995. *Id.*

The BCBS Companies have spent many millions of dollars extensively advertising and promoting their healthcare and health insurance services featuring the BCBS Marks. *Id.* at ¶10. Their promotional efforts include, among other things, print media, internet advertising, television commercials, sponsorships, promotions, public relations, brokers and retail partnerships, and federally facilitated marketplaces. *Id.* BCBSA owns numerous federal registrations for the BLUECARD, BLUE CROSS, and BLUE SHIELD Marks (the "BCBSA Registrations"). Rotunno Decl. at ¶5

### B. Anthem and the ANTHEM Marks

Anthem is one of the nation's largest healthcare and health benefits companies. Declaration of Janice Griffin ("Griffin Decl."), ¶6. Until 2022, Anthem conducted business as Anthem, Inc., which has roots tracing back to 1946. *Id.* Anthem is a prominent leader in the health insurance industry and currently

provides health, dental, vision, and/or pharmacy health insurance benefits to over 47 million people. *Id*.

Anthem has continually and prominently used the word ANTHEM alone and with other terms as trademarks in commerce in connection with healthcare and health insurance since at least as early as July 1991 ("the ANTHEM Marks"). *Id.* at ¶7. Anthem conducts insurance operations in all 50 states, the District of Columbia, and Puerto Rico (including Anthem BCBS and other Anthem companies). *Id*. Since its founding, Anthem has enjoyed continuous and significant growth, both in size as well as sales and revenue. Anthem's revenue exceeded $140 billion in each of the past two years. *Id*.

Anthem has extensively advertised and promoted its healthcare and health insurance services featuring the ANTHEM Marks and has served tens of millions of consumers and individuals directly and through its subsidiaries in its affiliated health plans in connection with the ANTHEM Marks. *Id*. at ¶9. Anthem's promotional efforts include, among other things, print media, internet advertising, television commercials, sponsorships, promotions, public relations, brokers and retail partnerships, and federally facilitated marketplaces. *Id.* Currently, over 26 million individuals are members of Anthem health plans featuring the ANTHEM Marks. *Id*.

In addition to its common law rights in the ANTHEM Marks, Anthem owns and licenses federal registrations of trademarks containing the term ANTHEM to identify its healthcare and health insurance services (the "ANTHEM Registrations"). Declaration of J. Ryan Hinshaw ("Hinshaw Decl."), ¶4.

### C. BCBS Company Plan Membership

Certain healthcare "providers" (e.g., doctors or hospitals) can contract with a BCBS Company, or "network," such as Anthem BCBS. Griffin Decl. at ¶10. "Members" (i.e., individuals) of a BCBS Company health plan are granted access to

the contractual discounts and other benefits (such as limits on member liability to providers) secured by BCBS Companies for members who seek services from those contracted providers. *Id.* Members of a BCBS Company receive an identification card that features a BCBSA-approved three-character prefix followed by up to 14 numeric or alphanumeric positions required for systemwide claim routing ("Subscriber ID") and that features the ANTHEM, BLUE CROSS, and/or BLUE SHIELD Marks. ("ID Cards")[1] *Id.* ID Cards are presented by members to healthcare providers in connection with health care services. *Id.* In turn, providers use information on the ID Cards to verify coverage, confirm eligibility for services, and submit claims to the insurance company for reimbursement of healthcare services. *Id.* at ¶¶11-13.

An employer can offer health insurance to employees by purchasing a group health insurance plan, like those offered by BCBS Companies including Anthem. *Id.* at ¶14. For a company to secure the benefits of membership in an Anthem BCBS plan (or other BCBS Company plan) for its employees, benefits which include (depending on the product) access to an Anthem BCBS provider network and BlueCard® - the nationwide networks of BCBS Companies described above - a company or employer must enter into an executed written contract with a company licensed to use the BCBS Marks such as Anthem BCBS. *Id.* Such agreements specify essential terms, including but not limited to, identifying the underlying policy or product offering, identifying who assumes underwriting risk for medical claims, and listing the types of benefits for members, as well as information related to coverage limits and co-pays. *Id.* The contracts also expressly grant the company/employer limited authorization to use certain BCBSA and Anthem word marks and design marks. *Id.* Anthem maintains a comprehensive, searchable database that includes all its authorized clients (*i.e.*, companies/employers who have purchased a group

---

[1] The BLUECARD Mark does not appear on valid ID Cards. Cullen Decl. at ¶8.

health insurance plan from Anthem). *Id.* Defendants are not one of them. LifeX never entered a contract with Anthem to offer employees a group health insurance plan or other health insurance benefits through Anthem. *Id.* at ¶15.

### D. Defendants' Wrongful Conduct

Defendant LifeX was incorporated in November 2024 and markets itself as a research company that collects and analyzes health data. *Id.* at ¶¶16-17. Defendant Benefit Health was incorporated in January 2024 and markets itself as a company that administers health benefit plans, including for LifeX. *Id*. Defendants Stephen Tucker, Rsyzard Bolko, Therese Hoard, William McClure, and Kristin Bullock have conceived, manage, control, and direct LifeX and Benefit Health. *Id.* at ¶16.

Defendants devised a scheme to induce consumers to purchase nonexistent health insurance through an alleged employee benefit plan, including purported Anthem BCBS plans, without authorization from Plaintiffs. Defendants utilize brokers to recruit individuals for "employment" with LifeX as "Research Associates" who are paid a small hourly wage to perform health research activities mainly consisting of filling out surveys about their own personal health information. Griffin Decl. at ¶¶17-18, Exhs. A, B. The surveys consist of questions targeted to determine whether Defendants' "employees" are healthy individuals between the ages of 18 and 40 years of age and less likely than individuals in other demographics to visit healthcare service providers, thus prolonging the timeframe before Defendants' illicit scheme is discovered. *Id.* Defendants and their brokers represent that upon employment with LifeX, a Research Associate is categorized as a W-2 employee who is entitled to employee benefits plans with lower rates—including the Anthem Blue Cross and Blue Shield plan. *Id.*

Defendants provide LifeX's new Research Associates with a LifeX Research Associate Guide that describes the Research Associate's role. *Id.* The guide features the ANTHEM, BLUECARD, BLUE CROSS, and BLUE SHIELD Marks

and explains that Research Associates can enroll in an Anthem BCBS health insurance plan as part of their employee benefits package. *Id*. at ¶19, Exh. A. The employee then pays LifeX a regular monthly payment (a "premium") for said group health insurance, the amount of which far outweighs the amount paid to the "employee" as "wages." *Id*. An excerpt from the LifeX Research Associate Guide is depicted below.





**CONFIRMING YOUR PHYSICIAN IS IN NETWORK**

1. Visit https://www.anthem.com/find-care/
2. Click "Basic search as a guest"
3. In the first dropdown menu, select Medical Plan or Network (may also include dental, vision, or pharmacy benefits).
4. In the second dropdown menu, select the state where the plan or network is offered. (For employer-sponsored plans, select the state where your employer's plan is contracted in. Most of the time, it's where the headquarters is located.)
5. In the third dropdown menu, select Medical (Employer-Sponsored).
6. In the last dropdown menu, select National PPO (BlueCard PPO). Click Continue.
7. Enter your location and search criteria or search by provider.

10    LifeX Research Associate Guide

*Id*. at ¶19, Exh. A.

Thereafter, when a Research Associate enrolls what he or she believes to be an Anthem BCBS plan, Defendants issue a fraudulent health insurance ID card

with a fake Subscriber ID, fake Anthem group number, and featuring the
ANTHEM, BLUECARD, BLUE CROSS, and BLUE SHIELD Marks. *Id*. at ¶19.
The ID card additionally features the LIFEX logo and states that it is administered
by Benefit Health Plan, Inc. *Id*. An example of one of Defendants' fraudulent ID
cards is depicted below.



*Id*.

Consumers purchasing the so-called benefits plan from LifeX will not
receive the health insurance coverage that they believed they purchased because
LifeX is not an authorized client that has ever contracted with Plaintiffs. LifeX and
its principals and affiliates are not contracted with any BCBS Company, including
Anthem BCBS, and are thus not authorized to use the ANTHEM, BLUECARD,
BLUE CROSS or BLUE SHIELD Marks and are ineligible to have access to any
of Plaintiffs' networks. *Id*. at ¶15. Defendants are not authorized, affiliated, or
associated with Plaintiffs, and are not under contract to offer any Anthem BCBS

plans or otherwise use the ANTHEM, BLUECARD, BLUE CROSS, or BLUE SHIELD Marks. *Id.*

###### E. Actual Confusion

Defendants' unauthorized use of the ANTHEM and BCBS Marks has caused numerous consumers to sign up for employment at LifeX, purchase what they mistakenly believe to be Anthem BCBS insurance, and mistakenly use what they believe to be a proper insurance ID card. *Id.* at ¶¶21-27.

Since Defendants began improperly using the ANTHEM and BCBS Marks in furtherance of their scheme, Anthem has and continues to receive inquiries from numerous healthcare providers presented with Defendants' fraudulent ID cards. *Id.* In the first such instance in April 2025, Anthem received an inquiry from the Cleveland Clinic, an Ohio-based health care provider, about a patient who presented an ID card that bore ANTHEM, BLUE CROSS, and BLUE SHIELD Marks, but which had an 11-digit ID number that did not conform to the Subscriber ID requirements that all ID cards feature. *Id.* at ¶22. The ID also card bore the LifeX and Benefit Health logos. *Id.* The purported member did not actually have health care insurance or related benefits through Anthem BCBS and, as a result, the services were not eligible for reimbursement at the more favorable participating provider rate negotiated by Anthem BCBS. *Id.* If the Cleveland Clinic provided services to the purported member, the charges for those services likely would be billed by the provider directly to the purported member because that individual does not have the Anthem BCBS insurance for which they believe they have been paying. *Id.*

Since that time, Anthem has received multiple additional inquiries from the Cleveland Clinic and other providers in various stages regarding fraudulent LifeX ID cards bearing the ANTHEM and BCBS Marks, including the card shown above. *Id.* at ¶¶24-25. In addition, Anthem received a message from other BCBS

Companies, Health Care Service Corporation and Blue Cross Blue Shield Florida, who had received an inquiry from other healthcare providers related to another LifeX card bearing the Anthem and BCBS Marks. *Id.* at ¶¶23, 26. None of these purported members actually had health care insurance or related benefits through Anthem BCBS. *Id.* at ¶¶21-27.

On June 27, 2025, Plaintiffs filed a complaint against Defendants alleging counterfeiting and trademark infringement, trademark dilution, false designation of origin, and unfair competition, based on Defendants' unauthorized use of the ANTHEM, BLUECARD, BLUE CROSS, and BLUE SHIELD Marks.

## III.   **LEGAL STANDARD**

To obtain a preliminary injunction or TRO, a movant must show (1) it is substantially likely to succeed on the merits; (2) it will suffer irreparable harm if the preliminary injunction or TRO is not granted; (3) the movant's threatened injury outweighs the harm the relief would inflict on the opposing party; and (4) the TRO or injunction would not be adverse to the public interest. *Ewe Grp., Inc. v. Bread Store, LLC*, 54 F. Supp. 3d 1343, 1347 (N.D. Ga. Sept. 22, 2014) (citing *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1307 (11th Cir. 2010)). Further, a movant who establishes a likelihood of success on the merits of a Lanham Act claim is afforded a statutory presumption of irreparable harm. 15 U.S.C. § 1116(a); *PureO Nat. Prods. LLC v. Locn Prods. LLC*, 2025 U.S. Dist. LEXIS 36663, at *13 (N.D. Ga. Feb. 11, 2025); *Parnall Law Firm, LLC v. Bert Brock Law LLC*, 2025 U.S. Dist. LEXIS 5397, at *9 (N.D. Ga. Jan. 10, 2025).

IV.  **ARGUMENT**

**A. Plaintiffs have a Strong Likelihood of Success on the Merits of their Trademark Infringement, False Designation of Origin, and Unfair Competition Claims**

For purposes of a motion for temporary restraining order and preliminary injunction, courts analyze trademark and unfair competition claims under 15 U.S.C. § 1114, 15 U.S.C. § 1125(a), and the Georgia Deceptive Trade Practices Act ("GDTPA") together. *Top Tobacco, L.P. v. Star Imps. & Wholesalers, Inc.*, 2021 U.S. Dist. LEXIS 155496, at *23-24 (N.D. Ga. Aug. 18, 2021); *see also PureO*, 2025 U.S. Dist. LEXIS 36663, at *42-43.

A plaintiff establishes it is likely to prevail on the merits of each of these claims if it shows that the "[d]efendant's marks are likely to cause consumer confusion." *Top Tobacco*, 2021 U.S. Dist. LEXIS 155496, at *24. In evaluating whether there is a likelihood of confusion, courts consider (1) the strength of the plaintiff's mark; (2) the similarity of the marks; (3) the similarity of the products and services; (4) the similarity of the sales methods and consumers; (5) the similarity of advertising methods; (6) the defendant's intent; and (7) proof of actual confusion. *Hi-Tech Pharms., Inc. v. Nutrition Res. Servs., Inc.*, 717 F. Supp. 3d 1318, 1326 (N.D. Ga. Feb. 15, 2024) (citing *Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1313 (11th Cir. 2001)). A plaintiff does not need to prove all—or even most—of these factors to establish a likelihood of confusion. *Univ. Of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1542 (11th Cir. 1985).  Here, however, all of the factors weigh strongly in Plaintiffs' favor.

1. Plaintiffs' Marks are Strong.

The ANTHEM, BLUECARD, BLUE CROSS, and BLUE SHIELD Marks are all registered, which "establishes a rebuttable presumption that the marks are protectable or 'distinctive.'" *Welding Servs. v. Forman*, 509 F.3d 1351, 1357 n.3

(11th Cir. 2007) (citing 15 U.S.C. § 1057(b)). Further, each mark is particularly strong because it is the subject of widespread and longstanding use, advertising, and consumer recognition. *Supra*, Sections II.A-B; *see also Hi-Tech*, 717 F. Supp. 3d at 1327 (finding marks strong where plaintiff "used one of the two marks for over twenty years and ha[d] spent much money and effort towards advertising and promoting the marks"); *Rothschild & Co. Continuation Holdings A.G. v. Sklarov*, 2020 U.S. Dist. LEXIS 54989, at *16 (N.D. Ga. Feb. 24, 2020) (finding marks strong where they were federally registered and "used for decades in connection with financial services in the U.S."). Defendants' deliberate adoption of the marks is further evidence of their strength. *See CPG Prods. Corp. v. Pegasus Luggage, Inc.*, 776 F.2d 1007, 1012 (Fed. Cir. 1985).

> 2. Defendants Are Using Plaintiffs' Identical Marks and Purport to Offer Identical Services.

The Defendants are using the Plaintiffs' identical marks. *See Hi-Tech*, 717 F. Supp. 3d at 1327-28 (noting that even "nearly identical" marks present a "substantial likelihood of confusion[,]" and "[t]he greater the similarity, the greater the likelihood of confusion") (quotations and citations omitted). *See also Louis Vuitton Malletier S.A. V. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 499-500 (S.D.N.Y. 2015) (finding that identical marks can support a likelihood of confusion due to counterfeiting, even if marks are used for dissimilar products and services).

Defendants also purport to provide the benefits of an Anthem BCBS network (i.e. identical services). *Cf. F.A.C.E. Trading, Inc. v. Famiano*, 2006 U.S. Dist. LEXIS 97715, at *34-35 (M.D. Fla. Jan. 10, 2006) (defendant's use of confusingly similar coupon cards was likely to cause confusion). And the consumers – purchasers of health insurance – are also identical.

Defendants' use of Plaintiffs' identical marks for identical services without authorization constitutes trademark infringement as a matter of law. The Eleventh

Circuit instructs that this alone is more than sufficient to support a finding of likelihood of confusion and grant a preliminary injunction. *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1206 (11th Cir. 2008) (noting confusion is "self-evident" in trademark infringement cases when parties use identical marks for identical products and services); *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985-86 (granting preliminary injunction, where defendant sold counterfeit jeans bearing plaintiff's marks); *see also Med. Sec. Card Co., LLC v. Scriptwell, Inc.*, 2024 U.S. Dist. LEXIS 244125, at *17-19 (D. Del. Oct. 29, 2024) (granting preliminary injunction upon finding defendant's use of similar mark on prescription drug discount cards created a likelihood of confusion, where both parties offered discount cards to prescription drug consumers for use at pharmacies).

3.  <u>Defendants Adopted Plaintiffs' Marks in Bad Faith.</u>

Defendants lure individuals into working for LifeX and purchasing nonexistent health insurance with false promises that LifeX employees may enroll in Anthem BCBS health insurance plans at lower rates. Defendants provide new LifeX employees with Research Associate Guides that feature the ANTHEM, BLUECARD, BLUE CROSS, and BLUE SHIELD Marks and state that employees can enroll in an Anthem BCBS plan as part of their employee benefits package. Then, Defendants solidify their trap by issuing fake health insurance cards featuring counterfeit ANTHEM, BLUECARD, BLUE CROSS, and BLUE SHIELD Marks—deceiving unsuspecting LifeX employees into believing they have access to and all the benefits of an Anthem BCBS network.

It cannot be any clearer that Defendants "adopted [Plaintiffs' Marks] with the intention of deriving a benefit from the [plaintiffs'] business reputation[.]" *Frehling Enters. v. Int'l Select Grp.*, Inc., 192 F.3d 1330, 1340 (11th Cir. 1999). *Cf. JP Morgan Chase & Co. v. Chase Fin. Grp.*, 2007 U.S. Dist. LEXIS 119480, at

*9-10 (N.D. Ga. May 11, 2007) (finding that defendant adopted plaintiff's CHASE mark "for the purpose of profiting from Chase's reputation" where defendant used mark to induce "vulnerable consumers ... to pay fees for loans that were never disbursed"). As with using identical marks for identical services, the Eleventh Circuit finds that "this fact alone may be enough to justify the inference that there is confusing similarity." *Frehling*, 192 F.3d at 1340; *accord JP Morgan*, 2007 U.S. Dist. LEXIS 119480, at *9; *Evol. Nutrition Assocs. v. Supplement Ctr., LLC*, 2017 U.S. Dist. LEXIS 220450, at *9-10 (N.D. Ga. Aug. 16, 2017); *Hi-Tech*, 717 F. Supp. 3d at 1329.

<h4>4.  <u>Defendants' Use of Plaintiffs' Marks has Caused Actual Confusion.</u></h4>

As noted above, even without actual confusion, it would be clear that Defendant's conduct creates a likelihood of confusion. But here, Defendant's scheme has barely begun, and already there are instances of actual confusion—which courts consider "the best evidence of a likelihood of confusion." *Ewe Grp.*, 54 F. Supp. 3d at 1350; *see also Sovereign Military Hospitaller Order of Saint John v. Fla Priory of the Knights Hospitallers of the Sovereign Order of Saint John*, 809 F.3d 1171, 1189 (11th Cir. 2015) (noting "even a very little" amount of actual confusion is "highly probative") (quotations omitted).

Anthem has received at approximately six inquiries from confused healthcare provider employees who mistakenly believed Defendants' health insurance cards, which bore the ANTHEM, BLUECARD, BLUE CROSS, and BLUE SHIELD Marks, were associated with Anthem—and those healthcare provider employees were presented with the fake health insurance cards by individuals who also mistakenly believed the cards were associated with Plaintiff, and that they were enrolled in an Anthem BCBS health insurance plan. *Cf. JPMorgan*, 2007 U.S. Dist. LEXIS 119480, at *9 (where plaintiff was contacted four times with complaints by confused consumers who believed defendant's

services were associated with plaintiff, noting "[s]uch evidence of actual confusion is entitled to substantial weight"); *F.A.C.E.*, 2006 U.S. Dist. LEXIS 97715, at \*35-36 (actual confusion favored likelihood of success on merits of trademark infringement and palming off claims, where there was evidence a confused consumer attempted to redeem defendant's coupon card while believing it was plaintiff's card).

In sum, the evidence supporting a likelihood of confusion is overwhelming. As such, Plaintiffs have a strong likelihood of prevailing on the merits of their trademark infringement, false designation of origin, and unfair competition claims.

## B. Plaintiffs have a Strong Likelihood of Success on the Merits of their Trademark Dilution Claim

In addition to Plaintiffs' trademark infringement claims, Plaintiffs also have a strong likelihood of success on their dilution claim.[2]

Under 15 U.S.C. § 1125(c), a plaintiff proves trademark dilution upon showing "(1) the plaintiff's mark is famous; (2) the defendant used the plaintiff's mark after the plaintiff's mark became famous; (3) the defendant's use was commercial and in commerce; and (4) the defendant's use of the mark has likely caused dilution." *Crossfit, Inc. v. Quinnie*, 232 F. Supp. 3d 1295, 1308-09 (N.D. Ga. Feb. 8, 2017).  All four requirements are satisfied here.

### 1. The ANTHEM, BLUE CROSS, and BLUE SHIELD Marks are Famous.

"[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of

---

[2] The Court does not need to reach the issue of the merits of Plaintiffs' dilution claim to issue a temporary restraining order and preliminary injunction, given that Plaintiffs established a likelihood of success on the merits of their trademark infringement, false designation of origin, and unfair competition claims.

the mark's owner." *Id.* at 1309 (quoting 15 U.S.C. § 1125(c)(2)(A)). In evaluating a mark's fame, courts consider "(1) the duration, extent, and geographic reach of advertising and publicity of the mark; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark was registered." *Id.* (quoting 15 U.S.C. § 1125(c)(2)(A)(i)-(iv)).

The BLUE CROSS and BLUE SHIELD Marks are famous. The registered BLUE CROSS and BLUE SHIELD Marks have been used since 1934 and 1939, respectively—not just by Plaintiffs, but also by the BCBS Companies. These entities have spent many millions of dollars advertising and promoting the BLUE CROSS and BLUE SHIELD Marks in all 50 states. Currently, about 118 million people—or 1 in 3 Americans—are consumers of health insurance offered by BCBS Companies. And several court and tribunal decisions, dating all the way back to the 1970s and 1980s, have held that the BLUE CROSS and BLUE SHIELD Marks are famous. *See, e.g. Nat'l Ass'n of Blue Shield Plans v. Lovelace*, 435 F. Supp. 115, 117 (N.D. Cal. 1977) ("Plaintiff's Blue Shield mark is a famous and strong mark, and therefore entitled to broad protection."); *Blue Cross & Blue Shield Ass'n v. Blue Cross Mut. Clinic, Inc.*, 612 F. Supp. 41, 44 (S.D. Fla. 1985) (finding the "BLUE CROSS word mark and BLUE CROSS design marks are famous and strong marks, whether used in association with one another or independently, in the identification of prepaid financing and administration of medical, hospital, and related health care services and in the provision of health care services"); *Cent. Benefits Mut. Ins. Co. v. Blue Cross & Blue Shield Ass'n*, 711 F. Supp. 1423, 1433 (S.D. Ohio 1989) (noting "[t]he Blue Cross and Blue Shield names and marks are strong and famous nationwide"); *Blue Cross and Blue Shield Ass'n v. Garrett Ltd./John Nunley*, WIPO Case No. D2003-0028 (March 12, 2003) (finding that the BLUE CROSS and BLUE SHIELD Marks had acquired a high degree of

- 17 -

distinctiveness and fame, given the "longstanding use of the BLUE CROSS and BLUE SHIELD marks, both separately and in conjunction, [BCBSA's] high volume of business transacted under or in connection with the marks, as well as the worldwide use, registration and recognition of the marks.").[3]

The ANTHEM Mark is also famous. As discussed above, Anthem has continually and prominently used the registered ANTHEM Mark in connection with healthcare and health insurance since at least as early as 1991. Anthem conducts business in all 50 states and has extensively advertised and promoted the ANTHEM Mark. Anthem currently provides commercial Anthem BCBS or Anthem Blue Cross branded healthcare plans to over 26 million members in the United States, including members in the state of Georgia.  Anthem's revenues exceeded $140 billion in each of the past two years. *Supra*, Section II.B. *Cf. Rothschild*, 2020 U.S. Dist. LEXIS 54989, at *16-25 (finding a likelihood of success on merits of trademark infringement and dilution claim, where plaintiff's marks were "used for decades in connection with financial services in the U.S."); *JPMorgan*, 2007 U.S. Dist. LEXIS 119480, at *11-12 (finding plaintiff's CHASE mark was famous, where plaintiff extensively used and advertised mark in field of financial services, advertised and branded issued cards with CHASE mark, and was one of the largest issuers of general purpose credit cards in the US); *Crossfit*, 232 F. Supp. 3d at 1309 (finding plaintiff's mark famous due to extensive advertising, including super bowl commercial, and strong social media and online presence).

Plaintiffs' widespread use of the ANTHEM, BLUE CROSS, and BLUE SHIELD Marks, as well as their extensive advertising and promotions featuring

---

[3] The full opinion can be accessed at https://www.wipo.int/amc/en/domains/decisions/html/2003/d2003-0028.html.

these marks, compels a finding that the ANTHEM, BLUE CROSS, and BLUE SHIELD Marks are famous.

    2.  <u>Defendants Used Plaintiffs' Marks in Commerce After the Marks Became Famous.</u>

Defendants began using the ANTHEM, BLUE CROSS, and BLUE SHIELD Marks in U.S. commerce in connection with the provision of healthcare and health insurance services in 2024—decades after Anthem and other BCBS Companies developing the marks' goodwill, and after the ANTHEM, BLUE CROSS, and BLUE SHIELD Marks became famous. Griffin Decl. at ¶16.

    3.  <u>Defendants' Use of Plaintiffs' Marks is Likely to Cause Dilution by Tarnishment.</u>

"Dilution by tarnishment occurs when a trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Crossfit*, 232 F. Supp. 3d at 1308-10 (citations omitted).

Defendant's conduct will tarnish the ANTHEM, BLUE CROSS, and BLUE SHIELD Marks. Defendant uses the ANTHEM, BLUE CROSS, and BLUE SHIELD Marks to deceive unsuspecting individuals into believing they have health insurance through Anthem BCBS, one of the most reputable and reliable health insurance brands in the U.S. When an individual attempts to have the costs of his or her medical care paid with the insurance purportedly indicated by Defendants' fraudulent insurance cards—which, like authorized insurance cards, are branded with the ANTHEM, BLUE CROSS, and BLUE SHIELD Marks—the cards do not work, and the individual is left with a bill for hundreds, if not thousands, of dollars – or without receiving requisite healthcare services. Griffin Decl. at ¶29. *See Moseley v. V. Secret Catalogue, Inc.*, 537 U.S. 418, 434 (2003)

- 19 -

("It may well be that direct evidence of dilution such as case surveys will not be necessary if actual dilution can reliably be proven through circumstantial evidence – the most obvious case is one where the junior and senior marks are identical."). The potential adverse impact on Plaintiffs' reputations caused by Defendants' scheme is tremendous. *Cf. JPMorgan*, 2007 U.S. Dist. LEXIS 119480, at *12-30 (finding defendant's "scheme to defraud customers" into paying fees for loans "certainly" created likelihood of dilution); *Rothschild*, 2020 U.S. Dist. LEXIS 54989, at *24-25 (defendant's use of plaintiff's mark for financial services tarnished plaintiff's mark where defendant was connected with stock loan fraud, as "[p]otential buyers of financial services do not know those entities are in reality not associated with Plaintiffs").

### C. Plaintiffs will Suffer Irreparable Harm Absent Relief

Plaintiffs' likelihood of success on the merits of their claims is beyond substantial. As such, there is a presumption that Plaintiffs will face irreparable harm absent relief. 15 U.S.C. § 1116(a); *PureO*, 2025 U.S. Dist. LEXIS 36663, at *13; *Parnall*, 2025 U.S. Dist. LEXIS 5397, at *9. Indeed, it is long established that "irreparable harm is virtually inherent in trademark infringement." *Decatur Fed. S&L Ass'n v. Peach State Fed. S&L Ass'n*, 1978 U.S. Dist. LEXIS 6935, at *21 (N.D. Ga. Dec. 29, 1978).

If Defendants continue to use the ANTHEM and BCBS Marks to defraud vulnerable consumers of health insurance, Plaintiffs' reputations will take a catastrophic hit. Griffin Decl. at ¶¶28-31. *Cf. Rothschild*, 2020 U.S. Dist. LEXIS 54989, at *24-25 (N.D. Ga. Feb. 24, 2020) (defendant's use of identical marks in stock loan fraud was "likely to harm Plaintiffs' reputation and goodwill built over decades" and gave rise to irreparable injury absent injunction); *see also Levi Strauss*, 51 F.3d at 984 (where defendant engaged in illicit enterprise to manufacture and sell counterfeit jeans bearing plaintiff's mark, finding "[t]here is

no doubt that the continued sales" of counterfeit jeans would damage plaintiff's reputation, as "such trademark infringement 'by its nature causes irreparable harm'") (quoting *Tally-Ho, Inc. v. Coast Cmty. College Dist.*, 889 F.2d 1018, 1029 (11th Cir. 1989)).

Indeed, if a provider bills Plaintiffs for services rendered to an individual who is not actually an Anthem BCBS plan member and Anthem therefore does not pay for such services, Anthem's reputation will be tarnished among both providers and members, who believe they have Anthem health insurance. Griffin Decl. at ¶¶29-39. Indeed, an individual who believed he or she was covered by an Anthem BCBS plan is likely to blame Plaintiffs if it turns out that he or she is not actually covered. *Id.* at ¶31.

Further, Plaintiffs, among the most prominent players in the health insurance space, have lost control of their reputations—this alone constitutes irreparable harm. *Ewe*, 54 F. Supp. 3d at 1351-52 (noting that a plaintiff's "harm in the form of loss of control of its reputation, loss of trade, and loss of goodwill" are "sufficient to give rise to a finding of irreparable harm even absent the presumption of such harm existing"); *Tob Tobacco*, 2021 U.S. Dist. LEXIS 155496, at *38-4) (noting "the lack of control over one's mark creates the *potential* for damage to reputation, which constitutes irreparable injury" and "[t]he most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods"); *McStumbles v. Griffin*, 2011 U.S. Dist. LEXIS 169196, at *12 (S.D. Ga. May 12, 2011) ("a plaintiff need not show that the infringer has actually damaged the plaintiff's reputation; the *loss of control* of one's reputation alone supplies the substantial threat of irreparable harm").

### D. The Balance of Harms Leans in Plaintiffs' Favor

"Defendants have no right to use [Plaintiffs' Marks], and therefore could suffer no legitimate hardship by being forced to stop that which [they have] no right to do." *Top Tobacco*, 2021 U.S. Dist. LEXIS 155496, at \*39. *Accord F.A.C.E.*, 2006 U.S. Dist. LEXIS 97715, at \*40-41 (finding that balance of harms tipped in plaintiffs' favor, as "Plaintiffs have an undeniable interest in protecting their mark from further harm[,]" and "Defendants cannot deny that they acted willfully"); *Med. Sec.*, 2024 U.S. Dist. LEXIS 244125, at \*20-21 (where defendant used similar mark for confusingly similar prescription drug discount cards, "the harm to Defendant may be discounted as harm that it brought upon itself").

Regardless, any harm to Defendants—who began conducting their illicit business last year—could not compare to the harm faced by Plaintiffs, healthcare providers, and individuals. *Ferrellgas Ptnrs., L.P. v. Barrow*, 143 Fed. App'x 180, 191 (11th Cir. 2005) (finding that "[t]he balance of hardships tips in favor of issuing the [preliminary injunction]" for trademark infringement, as "[Defendant] has been in business for a short period of time (two years), which suggests that it has limited goodwill of its own"); *McStumbles*, 2011 U.S. Dist. LEXIS 169196, at \*12-13 (granting preliminary injunction and finding "the potential harm to Defendant ... would be limited" because defendant "has only been in business for approximately two months" and "has had only a short time to develop any goodwill of its own").

### E. Enjoining and Restraining Defendants' Conduct Would Serve the Public Interest

Defendant's infringement alone is enough to establish that the public interest favors an injunction and TRO. *Evol Nutrition*, 2017 U.S. Dist. LEXIS 220450, at \*14 (finding that since "[t]he Lanham Act contemplates the protection of the purchasing public[,] ... it is in the public interest to prevent further infringement by

granting Plaintiff a preliminary injunction"); *McStumbles*, 2011 U.S. Dist. LEXIS 169196, at *14 (finding that "a preliminary injunction would serve the public interest by avoiding confusion in the marketplace").

But a TRO and preliminary injunction are especially crucial here, given the sheer depravity of Defendants' conduct. Defendants use the ANTHEM, BLUECARD, BLUE CROSS, and BLUE SHIELD Marks to maliciously deceive vulnerable people into thinking they are covered by an Anthem BCBS health insurance plan—when, in fact, they are likely not covered by *any* health insurance plan at all. And, since Defendants' fake insurance cards feature the ANTHEM, BLUECARD, BLUE CROSS, and BLUE SHIELD Marks, Defendants' victims do not realize they are uninsured until they need medical treatment.

Indeed, Defendants' conduct risk harm not only to Plaintiffs, but also to individuals and healthcare providers. Individuals who believe they have Anthem BCBS health insurance, but in reality do not, are likely to be harmed by having to pay for services out of pocket, which can be extremely expensive. Griffin Decl. at ¶29.  If they cannot pay out of pocket, they may not receive medically necessary services.  Individuals may also seek out certain healthcare services if they believe they are insured that they otherwise would not seek out, or make healthcare decisions based on their belief that they are insured. *Id*.  Providers who perform healthcare services believing individuals to be covered by insurance are likely to be harmed if it turns out that the services are not covered and the provider therefore must seek to recoup costs and fees from the individual out of pocket. *Id.* at ¶30. This is likely to hurt the provider both monetarily (in the event the individual is unable to pay) and reputationally, as well as create tension with the provider's local BCBS Company Plan over the experience. *Id.*

Defendants' conduct is far more egregious than conduct that courts have enjoined in other cases where the defendant used a confusingly similar mark for

health insurance services. *See Advantus Capital Mgmt. v. Aetna, Inc.*, 2006 U.S. Dist. LEXIS 77448 (D. Minn. Oct. 11, 2006) (granting preliminary injunction, as employees covered by defendant's health insurance plans "may see [defendant's similar mark] on their insurance card or on the health insurance plan itself" and associate the services with plaintiff); *Unity Health Plans Ins. Corp. v. Iowa Health Sys.*, 995 F. Supp. 2d 874 (W.D. Wisc. 2014) (public interest favored injunction, as there were "consumers who may purchase insurance through Unity Health on the mistaken assumption that they will get coverage at UnityPoint hospitals and clinics, or who may avail themselves of UnityPoint health services only to discover later that their Unity Health insurer does not cover those services"); *Communitycare HMO, Inc. v. MemberHealth, Inc.*, 2006 U.S. Dist. LEXIS 28121 (N.D. Okla. May 8, 2006) (granting preliminary injunction and TRO where defendant used confusingly similar name for health plan, as consumers who enrolled in defendant's plan could automatically be dropped from plaintiff's plan and lose coverage for some services). In all these cases—unlike here—consumers actually had some sort of health insurance through the defendant, yet the courts nevertheless issued injunctive relief.

Defendants' scheme presents a tremendous risk to public health and safety. The *Communitycare* court captured the gravity of this risk: "Unlike other product choices, this product choice could mean the difference between life and death." *Id.* at *38. Defendants' illicit conduct must be stopped.

## V.    CONCLUSION

Plaintiffs are likely to succeed on the merits of their claims for trademark infringement, counterfeiting, and unfair competition, as Defendants use identical marks for identical products and services for an identical consumer base. Plaintiffs are also likely to succeed on their claims for trademark dilution, as Defendants' use of the famous ANTHEM, BLUE CROSS, and BLUE SHIELD Marks is likely to

tarnish the marks and harm Plaintiffs' reputations. Plaintiffs will face irreparable harm absent relief, as consumers will associate Defendants' fraudulent health insurance services with Plaintiffs. Members of the public, including healthcare providers and individuals, will suffer tremendous harm if Defendants continue to use the ANTHEM, BLUECARD, BLUE CROSS, and BLUE SHIELD Marks to further their scheme. For the foregoing reasons, Plaintiffs respectfully requests that their Motion for Temporary Restraining Order and Preliminary Injunction be granted in all respects.

Dated: July 2, 2025

Respectfully submitted,
REED SMITH LLP

/s/ David W. Long-Daniels
David W. Long-Daniels (SBN 141916)
Email:   dlong-daniels@reedsmith.com
REED SMITH LLP
999 Peachtree Street NE
Suite 2500
Atlanta, GA  30309
Telephone: +1 470 947 5800
Facsimile: +1 470 947 5799

Robert N. Phillips (*Pro Hac Vice forthcoming*)
Email:   robphillips@reedsmith.com
Seth B. Herring (*Pro Hac Vice forthcoming*)
Email:   sherring@reedsmith.com
Fatima Mobin (*Pro Hac Vice forthcoming*)
Email:   fmobin@reedsmith.com
REED SMITH LLP
101 Second Street
Suite 1800
San Francisco, CA  94105-3659
Telephone: +1 415 543 8700
Facsimile: +1 415 391 8269

Counsel for Plaintiffs

## <u>LOCAL RULE 5.1 CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing document filed with the Clerk of Court has

been prepared in 14-point Times New Roman font, in accordance with Local Rule

5.1(C).

*/s/ David W. Long-Daniels*
David W. Long-Daniels
